# Case No. 2,590.

## In re CHANDLER.

[9 N. B. R. 514;[1] 13 Am. Law Reg. (N. S.) 310; 6 Chi. Leg. News, 229.]

District Court, N. D. Illinois. April 9, 1874.

BANKRUPTCY—PROOF OF DEBTS—WAGER CONTRACT.

A speculative option where the object of the parties is not a sale and delivery of the goods, but a settlement in money on differences— commonly called a "put,"—is a wagering contract and void, either as within the statutes against gambling or as against public policy, and is not a provable debt in bankruptcy.

[Cited in Re Green, Case No. 5,751; Clarke v. Foss, Id. 2,852.]

[The question in this case arises on the report of H. N. Hibbard, Esq., one of the registers of this court, on an application by the assignee of the bankrupts for an order to expunge the claims of the parties named, as well as a large number of other claims, depending on substantially the same facts. It appears from the testimony submitted with the register's report that in the month of

---

[1] [Reprinted from 9 N. B. R. 514, by permission.]

May, 1872, and for several years prior thereto, the bankrupts, Peyton R. Chandler and the firm of Chandler, Pomeroy & Co., were engaged in the business of buying and selling grain on the Chicago market, and as members of the board of trade of this city; that Chandler, Pomeroy & Co. were brokers and commission merchants, and Peyton R. Chandler dealt mainly on his own account, as a capitalist, through Chandler, Pomeroy & Co., who acted as his brokers.][2]

The bankrupts, Peyton R. Chandler, and the firm of Chandler, Pomeroy & Co., were engaged in buying and selling grain on the Chicago market, and as members of the board of trade of that city. In May, 1872, Peyton R. Chandler conceived the idea of making a corner in oats for the month of June then ensuing, and with that view he purchased all the "cash oats" as they arrived in the market, and took all the "options" offered him for June delivery—his purpose being to own all the oats in the market, and compel those who had sold "options" for June to pay his price; or, in other words, to settle with him by paying such differences as should exist between the prices at which he purchased the options and the price he should establish for cash oats on the last day of June, when his options matured. In pursuance of this plan, he purchased, between the 15th of May and the 18th of June, two million five hundred thousand bushels of cash oats, being all, or substantially all, the cash oats on the market, and also bought June "options" to the amount of two million nine hundred and thirty-nine thousand four hundred bushels. The total amount of oats in store in Chicago on the 18th of June was only two million seven hundred thousand bushels, and the total amount received during the remainder of the month was only eight hundred thousand bushels. As incidental to and part of the machinery of this corner, Chandler also sold what are called "puts," or privileges of delivering to him oats during the month of June for forty-one cents a bushel. These "put" contracts read as follows: "Received of E. F. $50, in consideration of which we give him, or the holder of this contract, the privilege of delivering to us or not, prior to 3 o'clock p. m. of June 30th, 1872, by notification or delivery, 10,000 bushels No. 2 oats, regular receipts, at 41 cents per bushel, in store, and, if delivered, we agree to receive and pay for the same at the above price. Chandler, Pomeroy & Co. P. R. Chandler. Chicago, June ——, 1872."

The amount paid by the purchaser of these "puts" was one-half cent per bushel for whatever quantity was named in the contracts. The total quantity of oats called for by these "puts" amounted to about three million seven hundred thousand bushels. When Chandler commenced to buy oats with a view to the

[2] [From 6 Chi. Leg. News, 229.]

corner, the price in the Chicago market was about thirty-nine cents a bushel. After he took possession of the market he put the price to forty-one cents and upwards, and held it there until the 18th of June. In the meantime the price had declined in New York and other markets, so that oats to ship were not worth over thirty-three to thirty-five cents, and July options for this market were not worth over thirty-six cents. On the 18th of June, P. R. Chandler and Chandler, Pomeroy & Co. failed, and the price declined before the close of business that day from forty-one to thirty cents, and continued to decline during the remainder of the month, so that at one time they were as low as twenty-six cents per bushel. Between the time of the failure and three o'clock on the 30th of June, the holders of the "puts" claim to have made tender to the bankrupts of the quantity of oats called for by their respective tickets, and the oats not being accepted and paid for, they sold them upon the market that day or the next, under the rules of the board of trade, and proved their claims for the differences between the price named in the "put" and that for which they sold. The total amount of claims thus proved was about four hundred thousand dollars, and the total amount received by the bankrupts for these puts was less than nineteen thousand dollars. The assignee of Chandler moved to expunge the claims of this kind from the list of debts proved.

Harding, McCoy & Pratt and Wirt & Dexter, for assignee.

Hitchcock & Dupee, Goudy & Chandler, and Dent & Black, for creditors.

BLODGETT, District Judge. The proof shows conclusively that the plans of Chandler and the fact that he was manipulating the market with express reference to a corner in oats for June, were well known and understood on the board of trade, while the number of these "put" claims, about one hundred and twenty-five, all, or substantially all, in favor of members of the board, show that the struggle between Chandler, who was endeavoring to hold up prices, and the sellers of "options" and holders of "puts," who were endeavoring to break the price, was quite generally participated in by members of the board. In other words, it was notorious that Chandler was endeavoring to keep the price at forty-one cents or upwards, while the sellers of "options" and holders of "puts" were endeavoring to break down the price. It is true that in this testimony some of the claimants say there was no "corner," or that they did not know that there was a corner, but the cross-examination shows that they knew Chandler was trying to make a corner, and they say he did not do it because he failed before the end of the month, so that by their own admission, they knew what he was attempting. knew the reasons for his purchase of such large quantities of "cash

oats," and options, and knew he did not sustain his corner because the "short" interest broke him down, and the moment a man bought a "put," he became identified with the short interest—his interests were antagonistic to Chandler.

The assignee attacks these claims upon the ground that they are fraudulent as against the other creditors of the bankrupt, the main ground, and the only one which I shall consider, being that they are wager-contracts, and therefore void. Without taking time to discuss all the points raised by the able arguments which have been adduced, and the various reasons urged for and against these claims, it is enough to say that it seems to me that the contracts in question partake of all the characteristics of a wager. It is in substance an assertion by the seller of the "put" that oats cannot be purchased on that market before three o'clock p. m. of the 30th of June for less than forty-one cents a bushel, and an undertaking to pay the difference between forty-one cents and any market price. If he, Chandler, sustains the price at forty-one cents or above, he wins the half-cent a bushel paid for the "put," because the holder will not deliver, while if the price goes below that named he is to pay the difference. This is practically the contract. It is manifestly a bet upon the future price of the grain in question, as any which could be made upon the speed of a horse or the turn of a card. The evidence in this case shows that in nearly all the cases of settlements on "put" or "option", contracts, the grain is never delivered nor expected to be delivered, but the parties simply pay the difference, as settled by the prices. But, if that were not so in all cases, it is clear that in this case no delivery of the grain was intended by these "put" holders, because they knew that Chandler controlled all the oats in the market and fixed the price, and that their only expectation for success depended on their being able to break the market before their time for delivery expired. Some of them say— Bensley, I think—that they intended to deliver the oats, but it is absurd to suppose that they intended to deliver, unless they could do so for less than forty-one cents. They intended to deliver if they could break Chandler, or prevent his "corner" from culminating, as the jockey may intend to walk his own horse over the course after he has poisoned or lamed that of his competitor. They did not intend to deliver, if Chandler succeeded. Thus a struggle inevitably ensued between Chandler and the holders of this immense amount of "puts" and "options,"· Chandler alone on one side attempting to hold up the price, and all the rest seeking to put it down. The fact that the sellers of "options" and holders of "puts" were able to get resolutions through the board of trade, making new warehouses, where oats had never been stored before, "regular" for the performance of these contracts, shows

the intensity of the contest and the overwhelming influences with which· Chandler had to contend. I do not mean to be understood as saying that the fact that Chandler sold "puts" to so many as to create an overwhelming opposition, makes the transaction any more or less a wager than if he had only sold one "put," but it shows the notoriety of the whole proceedings. From the very nature of the transaction the interest of the holder of the "put" is to break down the price and that of the seller is to maintain it. The number engaged in this transaction, and the quantities involved, demonstrate that neither party expected any grain to be delivered. Chandler expected to hold up the price, in which event no grain would be offered him, and the other parties must have known they could not get the grain to deliver unless they first broke Chandler, as he held all the grain, and then, although they might tender, he could not receive, so that in payment no actual delivery was anticipated. They made their tenders only as a method of establishing differences after he had failed, and was powerless.

That transactions of this kind are only wagers is abundantly established by authorities. Grizewood v. Blane, 11 C. B. 538; Brua's Appeal, 55 Pa. St. 298; Kirkpatrick v. Bonsall [72 Pa. St. 155], MS. Op. Sup. Ct. Pa.; Ex parte Marnham, 2 De Gex, F. & J. 634; Cassard v. Hinman, 1 Bosw. 207. It is true those cases arose under statutes making such transactions void as gaming contracts. But the test applied was: Did the parties intend to sell on one side and buy on the other the stocks which purported to be the subject matter of the transaction, or did they only intend to adjust the differences? And as it was found that they only meant differences when they said shares, the contracts were held to be essentially gambling contracts, and therefore void. It is said, however, that there is no statute in this state expressly prohibiting contracts of this kind, as there is in England and Pennsylvania; and, as the supreme court of this state has decided that wagers are not necessarily void, therefore, these contracts—not being inhibited by any express law of this state—are not void. There is no dispute that contracts of wager are valid at common law, unless affected with some special cause of invalidity. Ball v. Gilbert, 12 Metc. [Mass.] 397. But wagers which are contrary to public policy have always been held by the courts to be essentially void, without statutory prohibition, and cannot be made the ground of an action. Hartley v. Rice, 10 East. 22. And a high authority in the profession has stated the law on the subject of the validity of wagers with great force and clearness, when he says: "As the moral sense of the present day regards all gaming or wagering contracts as inconsistent with the interests of the community, and at variance with the laws of morality,

the exception necessarily becomes the rule." [Godsall v. Bolder] 2 Smith, Lead. Cas. 306. Indeed, any one rising from a full examination of the law applicable to wagers, as expounded by the courts, would undoubtedly testify that while he has found in the books, and especially among the older text writers and cases, general expressions to the effect that wagers were valid at common law, he has found the cases where they have been enforced to be extremely rare, and the courts have been astute to find reasons for not enforcing them.

Following this general current of authority, the supreme court of this state, under the statute prohibiting gaming, has decided that the wagers upon horse-races are void, and cannot be enforced; and that money paid on such wagers can be recovered back. [Tatman v. Strader] 23 Ill. 493; [Garrison v. McGregor] 51 Ill. 473. The language of the Illinois statute on which these decisions are based, is, in substance, that all promises made, &c., where the consideration or any part thereof shall be money won by gaming, &c., shall be void. The language of 8 & 9 Vict., on which Grizewood v. Blane and other English cases were decided, is: "All contracts or agreements, whether by parol or in writing, by way of gaming or wagering, shall be null and void." The precise question made in this case has never been before the supreme court of this state, to my knowledge, and I am not aware that it has ever been raised at the circuit, except in a late case before his honor Tree, J., of this city when he held that "option contracts for grain, when the parties intended only to pay the differences and not to deliver grain, were void, as wagering contracts." I quote him as reported in the daily papers of this city. But it hardly seems possible that any court called upon to construe the Illinois statute in the light of the expositions already made by our courts and of the English decisions upon a statute so substantially similar, could hesitate to pronounce these contracts wagers, and void as contrary to the statute. But even if not within the letter or spirit of the statute of this state, the common law authorities quoted, show that all wagers contrary to the public policy are void without reference to any statute. And, as the contracts under consideration are essentially nothing but bets upon the price of oats in this market within the time limited, and as it is obvious that the effect of such transactions is to beget wild speculations, to derange prices to make prices artificially high or low, as the interests, strength and skill of the manipulators shall dictate, thereby tending to destroy healthy business and unsettle legitimate commerce, there can be no doubt of the injurious tendency of such contracts, and that they should be held void as against public policy. As is most cogently said by the learned judge who delivered the opinion in the case cited from 55 Pa. St. 298: "Anything which induces men to risk their money or property without any other hope of return than to get for nothing any given amount from another, is gambling, and demoralizes the community, no matter by what name it may be called."

The financial disaster and ruin which followed "Black Friday," in New York, and the scarcely less damaging local consequences which followed the various "corners" which have either succeeded or been attempted in this city, furnish conclusive proof, if proof were needed, that such gambling operations should be held void, as contrary to public policy. The total amount paid by the claimants in these cases was less than nineteen thousand dollars, and yet the amount they claim is within the fraction of four hundred thousand dollars—a disparity between the consideration paid, and the sum demanded which strikes the mind at once as so grossly inequitable that the judicial conscience is shocked, and revolts from being made the instrument for enforcing such outrageous injustice. I do not intend to be understood as holding that every option contract for the delivery of grain or stock, or that every "put" is necessarily void, but only that all these contracts, in the light of the testimony before the court, were, in their essential features, gambling contracts. The parties, when they made them, did not intend to deliver the grain, but only at the utmost to settle the differences. They knew they could not obtain the grain to deliver if Chandler sustained his "corner," and their action in buying a "put" was virtually a bet on their part that he could not accomplish what they all knew he was endeavoring to do, that is, keep up the price through June to his own figures, and virtually a bet on his part that he could do so.

It is shown in the proof and urged in the argument, that the "put" is in itself a very harmless contract—that dealers frequently resort to them as a method of insuring prices. It is answer enough to this to say that the proof fails to show that such was the object of any of these claimants. Chandler was taking all the cash oats offered at the price named in the "puts" and upward, and none, with the exception of Bensley, claim that they had any oats to fill the "puts," at the time they bought, or bought for that purpose till after Chandler's failure. It is perhaps possible to imagine a dealer with a stock of grain on hand which he wishes to hold for an advance, who may take a privilege of this kind to insure himself against a decline while waiting for an advance. But the very act of offering to sell a "put" either implies that the seller has control of the market, so that he expects to make his own price, or else it is a mere reckless as-

sertion of the seller's opinion that the price will be maintained, either of which partakes of the character of a bet.

"A wager," says Bouvier, "is a contract by which two or more parties agree that a sum of money or other thing shall be paid or delivered to one of them on the happening, or not happening, of an uncertain event." To say that these contracts were taken for the purpose of insurance is too far-fetched an excuse, and evidently an afterthought. In what I have said I do not intend to vindicate Chandler. His conduct was as reprehensible as that of the claimants. All were engaged in an immoral and illegal transaction, and this court ought not to allow its powers to be prostituted to the enforcement of these contracts for either party. Money lost at play or in gaming cannot be recovered except where an action is given by statute; but, as I have already intimated my opinion that these cases are within the statute of this state on the subject of gaming under which money paid may be recovered back, I shall allow the claimants to prove their claims for the amounts actually paid by them respectively, which is a half cent per bushel on the grain named on their tickets.